**KAZEROUNI LAW GROUP, APC**
Abbas Kazerounian, Esq. (SBN: 249203)
ak@kazlg.com
Mona Amini, Esq. (SBN: 296829)
mona@kazlg.com
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

**CROSNER LEGAL, P.C.**
Zachary M. Crosner, Esq. (SBN: 272295)
zach@crosnerlegal.com
Blake R. Jones (SBN: 211221)
blake@crosnerlegal.com
Michael R. Crosner (SBN: 41299)
mike@crosnerlegal.com
433 N. Camden Dr., Ste. 400
Beverly Hills, CA 90210
Telephone: (310) 496-5818
Facsimile:  (310) 510-6429

*Attorneys for Plaintiffs,*
Linda Mesa and Robert Caldwell

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LINDA MESA AND ROBERT CALDWELL, individually and on behalf of all others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>ENLOE MEDICAL CENTER; and DOES 1-100, Inclusive,<br><br>                    Defendants. | Case No.: 2:20-cv-02483-JAM-KJN<br><br>SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF:<br><br>1. CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE §§ 56, ET SEQ.;<br>2. CALIFORNIA BUS. & PROF. CODE §§ 17200, ET SEQ.; AND<br>3. NEGLIGENCE<br><br>JURY TRIAL DEMANDED |

### INTRODUCTION

1. Plaintiffs Linda Mesa and Robert Caldwell, individually and on behalf of all others similarly situated (collectively as "Plaintiffs"), by Plaintiffs' attorneys, bring this action to challenge the actions of ENLOE MEDICAL CENTER ("Enloe" or "Defendant") and DOES 1-100 (collectively "Defendants") for Enloe's unlawful and unauthorized disclosure of Plaintiffs' confidential medical information in violation of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, *et seq*. (the "Act" or "CMIA"), California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq. (the "UCL"); and Negligence.

2. Under the Act, Plaintiffs and all other persons similarly situated had a right to keep their personal medical information provided to Defendant confidential. The short title of the Act states, "[t]he Legislature hereby finds and declares that persons receiving health care services have a right to expect that the confidentiality of individual identifiable medical information derived by health service providers be reasonably preserved.  It is the intention of the Legislature in enacting this act, to provide for the confidentiality of individually identifiable medical information, while permitting certain reasonable and limited uses of that information." The Act specifically provides that "[n]o provider of health care, health care service plan, or contractor shall disclose medical information regarding a patient of the provider of health care or an enrollee or subscriber of a health care service plan without first obtaining an authorization...." Civil Code. § 56.10(a).  The Act further provides that "[e]very provider of health care, health care service plan, pharmaceutical company, or contractor who creates, maintains, preserves, stores, abandons, destroys, or disposes of medical records shall do so in a manner that preserves the confidentiality of the information contained therein. Any provider of health care, health care service plan, pharmaceutical company, or contractor who negligently creates, maintains, preserves, stores,

abandons, destroys, or disposes of medical records shall be subject to the remedies ... provided under subdivisions (b) ... of Section 56.36."  Civil Code § 56.101.

3.   Civil Code § 56.36(b) provides Plaintiffs, and all other persons similarly situated, with a private right to bring an action against Defendant for violation of Civil Code § 56.101 by specifically providing that "[i]n addition to any other remedies available at law, any individual may bring an action against any person or entity who has negligently released confidential information or records concerning him or her in violation of this part, for either or both of the following: (1) ... nominal damages of one thousand dollars ($1,000).  In order to recover under this paragraph, *it shall not be necessary that the plaintiff suffered or was threatened with actual damages*. (2) The amount of actual damages, if any, sustained by the patient."  (Emphasis added)

4.   This class action arises from Defendant's negligence and failure to properly maintain, preserve, and/or store Plaintiffs' and all other similarly situated persons' confidential medical information, which allowed an unauthorized person to access and few the unencrypted personal identifying information (PII) and confidential medical information of Plaintiffs and other persons similarly situated in violation of the Confidentiality of Medical Information Act, Cal. Civ. Code §§ 56, et seq.; California's Unfair Competition Law, Cal. Civ. Code §§ 17200, et seq.; and Negligence.

5.   Plaintiffs make these allegations on information and belief, with the exception of those allegations that pertain to a plaintiff, or to a plaintiff's counsel, which Plaintiffs allege based on personal knowledge.

6.   While many violations are described below with specificity, this Complaint alleges violations of the statute cited in its entirety.

7.   Unless otherwise indicated, the use of any Defendant's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors,

assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that defendant named.

## JURISDICTION AND VENUE

8. This Court has jurisdiction over this action under California Code of Civil Procedure section 410.10. The aggregated amount of damages incurred by Plaintiffs and the Class exceeds the $25,000 jurisdictional minimum of this Court. The amount in controversy as to the Plaintiffs individually and each individual Class member does not exceed $75,000, including interest and any pro rata award of attorneys' fees, costs, and damages.

9. Venue is proper in this Court under California Bus. & Prof. Code § 17203, Code of Civil Procedure § 395(a) and § 395.5 because Defendant does business in the State of California, and in the County of Sacramento. Defendant has obtained medical information in the transaction of business in the County of Sacramento, which has caused both obligations and liability of Defendant to arise in the County of Sacramento. Further, Plaintiffs are also residents of the County of Sacramento.

10. Further, this action does not qualify for federal jurisdiction under the Class Action Fairness Act because the home-state controversy exception under 28 U.S.C. § 1332(d)(4)(B) applies to this action because (1) greater than two thirds of the members of the proposed Class are citizens of the State of California, and (2) Defendant is a citizen of the State of California.

## PARTIES

11. Plaintiff Linda Mesa is a resident and citizen of the State of California and the County of Sacramento.

12. Plaintiff Robert Caldwell is a resident and citizen of the State of California and the County of Sacramento.

13. Defendant Enloe is a California Corporation that, at all relevant times, was authorized to do business within the State of California and is doing business in

the State of California.

14. Enloe is a hospital providing people in Sacramento and Chico, California and surrounding communities with medical care.   Per Defendant's website (https://www.enloe.org/) Enloe is the largest employer in Butte County, and employs more than 3,000 dedicated staff and has more than 300 physicians on their medical staff.[1]

15. The true names and capacities, whether individual, corporate, associate, or otherwise, of Defendant sued herein as DOES 1 through 100, inclusive, are currently unknown to Plaintiff, who therefore sue the Defendant by such fictitious names under the Code of Civil Procedure § 474.   Each Defendant designated herein as a DOE is legally responsible in some manner for the unlawful acts referred to herein.   Plaintiffs will seek leave of court and/or amend this complaint to reflect the true names and capacities of the Defendants designated hereinafter as DOES 1 through 100 when such identities become known.   Any reference made to a named Defendant by specific name or otherwise, individually or plural, is also a reference to the actions or inactions of DOES 1 through 100, inclusive.

16. At all times herein mentioned, defendants, and each of them, were an agent or joint venturer of each of the other defendants, and in doing the acts alleged herein, were acting with the course and scope of such agency.   Each defendant had actual and/or constructive knowledge of the acts of each of the other defendants, and ratified, approved, joined in, acquiesced and/or authorized the wrongful acts of each co-defendant, and/or retained the benefits of said wrongful acts.

17. Defendants, and each of them, aided and abetted, encouraged and rendered substantial assistance to the other Defendants in breaching their obligations to

---

[1]    https://www.enloe.org/about-us/about-us

SECOND AMENDED CLASS ACTION COMPLAINT

Plaintiffs and the Class, as alleged herein. In taking action, as particularized herein, to aid and abet and substantially assist the commissions of these wrongful acts and other wrongdoings complained of, each of the Defendants acted with an awareness of his/her/its primary wrongdoing and realized that his/her/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

## FACTUAL ALLEGATIONS

18. Plaintiffs incorporate by reference all of the above paragraphs of this complaint as if fully stated herein.

19. On or about September 10, 2020, Defendant ENLOE MEDICAL CENTER ("Enloe" or "Defendant") disseminated a Notice of Data Breach letter (the "Letter") to Plaintiffs and members of the class alerting them that in May 2020 its third party cloud computing provider, fundraising and financial services vendor, Blackbaud, Inc. ("Blackbaud"), experienced a ransomware incident which resulted in an unknown actor accessing, exfiltrating and thereby acquiring access to and viewing certain Blackbaud customer data, which included unencrypted data relating to Enloe's patients. Following its own investigation, Enloe determined that the its Blackbaud systems were in fact compromised, which allowed an unauthorized person to access Enloe's patient's personal and medical information, including, at minimum, Plaintiffs' and the class members' patient names, addresses, patient date of birth, phone number and/or email address, medical treatment discharge dates and departments where the patients received care. Enloe could not definitively rule out that Plaintiffs' and the class members' personal and medical information were safe from this unauthorized access.  A sample of Enloe's "Notice of Data Breach" Letter sent to Plaintiffs and similarly situated Enloe patients is attached hereto as **Exhibit A**.

20. Despite the fact that Blackbaud reported it had been the victim of a ransomware attack and data breach, exposing the private information and even private health

information of its clients' students, patients, and donors in May 2020, Enloe did not provide notice to Plaintiffs and similarly situated class members until on or about September 10, 2020.

21.   Blackbaud's initial description of the security incident posted on its website on or about July 16, 2020[2] indicated that "the cybercriminal removed a copy of the subset of data from our self-hosted environment… The subset of customers who were part of this incident have been notified and supplied with additional information and resources." Blackbaud also stated that it paid the cybercriminal's ransom as protecting customers' data is the company's "top priority." Thereafter on or about September 29, 2020, Blackbaud posted an update on its website regarding the security incident which revealed that "for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords."[3]

22.   In addition to the information posted on its own website, Blackbaud filed a report with the United States Securities and Exchange Commission (SEC) which confirmed that "[p]rior to locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from [its] self-hosted (private cloud) environment." Blackbaud's SEC filing also confirmed that "further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords."[4]

---

[2]      A copy of Blackbaud's initial description of the security incident posted on its website on or about July 16, 2020 is attached hereto as **Exhibit B**.
[3]      A copy of Blackbaud's updated description of the security incident posted on its website on or about September 27, 2020 is attached hereto as **Exhibit C**.
[4]      A copy of Blackbaud's report filed with the United States Securities and Exchange Commission is attached hereto as **Exhibit D**.

23. Upon information and belief, the unauthorized individual(s) who gained access to Blackbaud's systems may not have actually deleted the data exfiltrated in the ransomware attack and the unauthorized individual(s) may have kept a copy of the data of Plaintiffs and other similarly situated persons for later sale on the dark web or black market.

24. At no point in time did Plaintiffs give authorization for Defendant to reveal or disclose Plaintiffs' personal medical information to any other person, including Blackbaud. Plaintiffs where never informed and never consented to their personally identifiably information (PII), protected health information (PHI) and/or confidential medical information being disclosed to Blackbaud.

25. Pursuant to Cal. Civ. Code § 56.10(a), a provider of health care, health care service plan, or contractor shall not disclose medical information regarding a patient of the provider of health care **without first obtaining an authorization**, except as provided in subdivision (b) or (c).

26. Subdivision (b) of Cal. Civ. Code § 56.10 provides an exhaustive list of circumstances under which Defendant *must* disclose medical information without prior authorization.

27. Subdivision (c) of Cal. Civ. Code § 56.10 provides an exhaustive list of circumstances under which Defendant *may* disclose medical information without prior authorization.

28. Neither subdivision (b) or (c) of Cal. Civ. Code § 56.10 include disclosing allowing access to Plaintiffs' and the Class members' medical information to an unauthorized vendor in connection with fundraising activities, or other unidentified unauthorized persons as an exception to the mandatory authorization required under Cal. Civ. Code § 56.10(a).

29. Further, Cal. Civ. Code 56.10(d) states that unless "expressly authorized by a patient, enrollee, or subscriber, or as provided by subdivisions (b) and (c), a provider of health care . . . shall not intentionally share, sell, use for marketing,

or otherwise use medical information for a purpose not necessary to provide health care services to the patient."

30.  "Authorization" is defined under the CMIA as obtaining permission in accordance with Cal. Civ. Code § 56.11 (or § 56.21 in the context of an employer disclosing medical information).

31.  Enloe did not obtain valid authorization from as defined under Cal. Civ. Code § 56.11 of the CMIA prior to disclosing Plaintiffs and the Class members' personal data, including PII, PHI and/or medical information to Blackbaud or other unidentified unauthorized third parties.

32.  Through the above, Defendant recklessly failed to take adequate precautions to safeguard the confidential medical information of Plaintiffs and similarly situated members of the Class.

33.  Through the above conduct, Enloe carelessly, recklessly, negligently, and impermissibly revealed Plaintiffs' and the Class members' sensitive personal information and confidential medical information to Blackbaud without maintaining any control over the security of the data; and as a result of disclosing their personal data to Blackbaud, Enloe allowed and caused Plaintiffs' and the Class members' personal data, including PII, PHI, and medical information to be accessed and exfiltrated by unauthorized third parties.

34.  In selecting Defendant as their healthcare provider, Plaintiffs relied on Defendant to not disclose their PII, PHI and/or confidential information to unauthorized third parties, including Blackbaud, and entrusted Defendant to use adequate privacy and security provisions with regard to Plaintiffs' personal information and medical information.

35.  Upon information and belief, Blackbaud has not provided verification or further information to Enloe regarding the disposition of the data to confirm that the stolen data has been destroyed, nor does Enloe or Blackbaud know whether the other unidentified unauthorized third parties who accessed and/or exfiltrated the

data maintained the data in a manner to prevent others from accessing or acquiring Plaintiffs' and the Class members PII, PHI and/or medical information.

36. Plaintiffs were distressed by the fact that Defendant had so carelessly and unreasonably disclosed Plaintiffs' personal medical information to unauthorized persons, including Blackbaud, in violation of Cal. Civ. Code §§ 56, et seq.

37. Plaintiffs have suffered from increased stress, embarrassment, humiliation, frustration, fear and anxiety and bear an increased risk of identity theft, including medical identity theft, as a result of Defendant's reckless exposure of Plaintiffs' confidential medical information to unauthorized persons, including Blackbaud.

38. In recognition of the important privacy rights that individuals expect to have over their private, sensitive medical information, Federal laws, such as the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), were also enacted to provide data privacy and security provisions to help safeguard patients' personal information and medical information. Similarly, California has enacted the Confidentiality of Medical Information Act, Civil Code §§ 56, et seq.

39. Based upon the information posted on the U.S. Department of Health and Human Services' official website, on 09/10/2020, Defendant reported to the U.S. Department of Health & Human Services' Office for Civil Rights that the data breach described herein affected **33,575 individuals**.

40. The HIPAA Breach Notification Rule, 45 CFR §§ 164.400-414, requires HIPAA covered entities to provide notification following a breach of unsecured protected health information. Following a breach of unsecured protected health information, covered entities must provide notification of the breach to affected individuals. Covered entities must *only* provide the required notifications if the breach involved unsecured protected health information. Unsecured protected health information is protected health information that has not been rendered

unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the Secretary of the U.S. Department of Health and Human Services in guidance. Under approved guidance of the U.S. Department of Health and Human Services, protected health information ("PHI") is rendered unusable, unreadable, or indecipherable to unauthorized individuals if (1) electronic PHI has been encrypted as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without use of a confidential process or key" (45 CFR § 164.304 definition of encryption) and (2) such confidential process or key that might enable decryption has not been breached.

41.   By reporting the data breach discussed herein to the U.S. Department of Health and Human Services and by sending its Notice of Data Breach Letter attached to Plaintiffs and members of the Class. Defendant has determined and is affirming that Plaintiffs' and the Class' electronic PHI was either not encrypted at all, or if it was encrypted, the encryption has been breached by the unauthorized third party. As a result, Defendant was negligent for failing to encrypt or adequately encrypt Plaintiffs' and the Class' electronic medical information and providing unauthorized third parties, including Blackbaud, access to such information. Further, because Plaintiffs' and the Class' identifiable medical information was not rendered unusable, unreadable, or indecipherable, the unauthorized third party or parties who accessed and/or exfiltrated Plaintiffs' and the Class' identifiable medical information from Defendant's computer database server were able to and did in fact view Plaintiffs' and the Class members' medical information.

42.   This action seeks redress against Defendant for its unlawful and unauthorized disclosure of confidential medical information of Plaintiffs and similarly situated members of the putative class.

43. Defendant knew or should have known that PII and PHI are high-risk targets for identity thieves. In 2014, the FBI informed that "[c]yber actors will likely increase cyber intrusions against healthcare systems" and warned that the "healthcare industry is not technically prepared to combat against cyber criminals' basic cyber intrusion tactics, techniques and procedures[.]"[5]

44. The American Medical Association ("AMA") has also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[6]

45. The Identity Theft Resource Center reported that the Medical/Healthcare sector had the second largest number of breaches in 2018 and the highest rate of exposure per breach. According to the ITRC this sector suffered 363 data breaches exposing over 9 million records in 2018.[7] These included Blue Cross Blue Shield of Michigan (15K records exposed), Atrium Health (over 2M records exposed), UnityPoint Health (over 1M records), LifeBridge Health (over 500K), FastHealth Corporation (over 600K records), among others.

### *PII/PHI Is a Valuable Property Right*

46. PII/PHI is a valuable property right.[8] California has repeatedly recognized this property right, most recently with the passage of the California Consumer

---

[5]     *See* FBI CYBER DIVISION, (U) HEALTH CARE SYSTEMS AND MEDICAL DEVICES AT RISK FOR INCREASED CYBER INTRUSIONS FOR FINANCIAL GAIN, *supra*.

[6]     Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, Am. Med. Ass'n (Oct. 4, 2019), https://www.ama-assn.org/practice-management/ sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

[7]     Identity Theft Resource Center, 2018 End-of-Year Data Breach Report 2, *available at* https://www.idtheftcenter.org/wp-content/uploads/2019/02/ITRC_2018-End-of-Year-Aftermath_FINAL_V2_combinedWEB.pdf.

[8]     *See* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets*, 15 RICH. J.L. & TECH. 11, at *2 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

Privacy Act of 2018. In a Federal Trade Commission ("FCC") roundtable presentation, former Commissioner, Pamela Jones Harbour, underscored this point by observing:

> Most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis – and profit.[9]

47. The value of PII/PHI as a commodity is measurable.[10] "PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets."[11] It is so valuable to identity thieves that once PII/PHI has been disclosed, criminals often trade it on the "cyber black-market" for several years.

48. Companies recognize PII/PHI as an extremely valuable commodity akin to a form of personal property. For example, Symantec Corporation's Norton brand has created a software application that values a person's identity on the black market.[12]

49. As a result of its real value and the recent large-scale data breaches, identity thieves and cyber criminals have openly posted credit card numbers, Social Security numbers, PII and other sensitive information directly on various Internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims. In one study, researchers found hundreds of websites displaying stolen

---

[9]     Federal Trade Commission, *Statement of FTC Commissioner Pamela Jones Harbour* (Remarks Before FTC Exploring Privacy Roundtable) (Dec. 7, 2009), https://www.ftc.gov/public-statements/2009/12/remarks-ftc-exploring-privacy-roundtable.
[10]     *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market* (April 28, 2014), *available at* http://www.medscape.com/viewarticle/824192.
[11]     *See* Soma, *Corporate Privacy Trend, supra.*
[12]     Risk Assessment Tool, Norton 2010, www.everyclickmatters.com/victim/assessment-tool.html.

PII and other sensitive information. Strikingly, none of these websites were blocked by Google's safeguard filtering mechanism – the "Safe Browsing list."

50.    PHI is particularly valuable. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security numbers and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[13] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen social security or credit card number.[14]

51.    Recognizing the high value that consumers place on their PII/PHI, some companies now offer consumers an opportunity to sell this information to advertisers and other third parties. The idea is to give consumers more power and control over the type of information they share – and who ultimately receives that information. By making the transaction transparent, consumers will make a profit from the surrender of their PII/PHI.[15] This business has created a new market for the sale and purchase of this valuable data.[16]

52.    Consumers place a high value not only on their PII/PHI, but also on the *privacy* of that data. Researchers shed light on how much consumers value their data privacy – and the amount is considerable. Indeed, studies confirm "when

---

[13]    Adam Greenberg, *Health Insurance Credentials Fetch High Prices in the Online Black Market* (July 16, 2013), *available at* https://www.scmagazine.com/home/security-news/health-insurance-credentials-fetch-high-prices-in-the-online-black-market/.

[14]    Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014) *available at* https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

[15]    Steve Lohr, *You Want My Personal Data? Reward Me for It*, N.Y. Times (July 16, 2010) *available at* https://www.nytimes.com/2010/07/18/business/ 18unboxed.html.

[16]    *See* Julia Angwin and Emil Steel, *Web's Hot New Commodity: Privacy*, Wall Street Journal (Feb. 28, 2011) *available at* https://www.wsj.com/articles/SB10001424052748703529004576 160764037920274.

privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[17]

53.  One study on website privacy determined that U.S. consumers valued the restriction of improper access to their PII between $11.33 and $16.58 per website.[18]

54.  Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

### Theft of PII/PHI Has Grave and Lasting Consequences for Victims

55.  A data breach is an incident in which sensitive, protected, or confidential data has potentially been viewed, stolen, or used by an individual unauthorized to do so. Data breaches are becoming increasingly more common and harmful. In 2014, 783 data breaches were reported, with at least 85.61 million total records exposed. By 2019, 3,800 data breaches were reported, with at least 4.1 billion total records exposed.[19]

56.  Theft or breach of PII/PHI is serious. The United States Government Accountability Office noted in a June 2007 report on Data Breaches ("GAO Report") that identity thieves use PII to take over existing financial accounts, open new financial accounts, receive government benefits and incur charges and credit in a person's name.[20] As the GAO Report states, this type of identity

---

[17]    Janice Y. Tsai, et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study Information Systems Research* 22(2) 254, 254 (June 2011), *available at* https://www.jstor.org/stable/23015560?seq=1# page_scan_tab_contents.

[18]    II–Horn, Hann, et al., *The Value of Online Information Privacy: An Empirical Investigation* (Mar. 2003) at table 3, *available at* https://ideas.repec.org/ p/wpa/wuwpio/0304001.html (emphasis added).

[19]    Chris Brook, *What's the Cost of a Data Breach in 2019*, Digital Guardian (July 30, 2019), *available at* https://digitalguardian.com/blog/whats-cost-data-breach-2019.

[20]    *See* GAO, GAO Report 9 (2007) *available at* http://www.gao.gov/new.items/d07737.pdf.

theft is so harmful because it may take time for the victim to become aware of the theft and can adversely impact the victim's credit rating.

57.   In addition, the GAO Report states that victims of identity theft will face "substantial costs and inconveniences repairing damage to their credit records … [and their] good name." According to the U.S. Federal Trade Commission ("FTC"), identity theft victims must spend countless hours and large amounts of money repairing the impact to their good name and credit record.[21]

58.   Identity thieves use personal information for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.[22] According to Experian, "[t]he research shows that personal information is valuable to identity thieves, and if they can get access to it, they will use it" to among other things: open a new credit card or loan; change a billing address so the victim no longer receives bills; open new utilities; obtain a mobile phone; open a bank account and write bad checks; use a debit card number to withdraw funds; obtain a new driver's license or ID; use the victim's information in the event of arrest or court action.[23]

59.   According to the IBM and Ponemon Institute's 2019 "Cost of a Data Breach" report, the average cost of a data breach per consumer was $150 per record.[24] Other estimates have placed the costs even higher. The 2013 Norton Report estimated that the average cost per victim of identity theft—a common result of

---

[21]   *See* FTC Identity Theft Website: https://www.consumer.ftc.gov/features/feature-0014-identity-theft.

[22]   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 16 C.F.R. § 603.2. The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." *Id.*

[23]   *See* Susan Henson, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself?*, EXPERIAN (Sept. 7, 2017), *available at* https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[24]   Brook, *What's the Cost of a Data Breach in 2019*, *supra.*

16

data breaches—was $298 dollars.[25]   And in 2019, Javelin Strategy & Research compiled consumer complaints from the FTC and indicated that the median out-of-pocket cost to consumers for identity theft was $375.[26]

60.   The consequences can be even more serious when the hack includes taking PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[27] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[28] "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[29]

61.   Further, medical data is more valuable than other commonly available personal data. "While a stolen credit card number might be sold for just a few cents, medical files can be worth as much as $1,000 each" or more.[30]

62.   A report published by the World Privacy Form and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

   •   Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters.

---

[25]   Norton By Symantec, 2013 Norton Report 8 (2013), *available at* https://yle.fi/tvuutiset/uutiset/upics/liitetiedostot/norton_raportti.pdf.
[26]   Facts + Statistics: *Identity Theft and Cybercrime*, Insurance Information Institute, *available at* https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime (citing the Javelin report).
[27]   Pam Dixon, et al., *The Geography of Medical Identity Theft* (Dec. 12, 2017), https://www.ftc.gov/system/files/documents/public_comments/2018/01/00037-142815.pdf.
[28]   *See* FBI CYBER DIVISION, (U) HEALTH CARE SYSTEMS AND MEDICAL DEVICES AT RISK FOR INCREASED CYBER INTRUSIONS FOR FINANCIAL GAIN 2 (2014), *available at* https://publicintelligence.net/fbi-health-care-cyber-intrusions/ (FBI, April 8, 2014).
[29]   *See* Federal Trade Commission, *Medical Identity Theft*, *available at* http://www.consumer.ftc.gov/articles/0171-medical-identity-theft.
[30]   Brian O'Connor, *Healthcare Data Breach: What to Know About Them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

These changes can affect the healthcare a person receives if the errors are not caught and corrected.

- Significant bills for medical goods and services not sought or received.

- Issues with insurance, co-pays, and insurance caps.

- Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

- Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

- As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

- Phantom medical debt collection based on medical billing or other identity information.

- Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.

63. A person whose PII/PHI has been compromised may not see any signs of identity theft *for years*. According to the GAO Report:

> "[L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."

64. For example, in 2012, hackers gained access to LinkedIn's users' passwords. However, it was not until May 2016, four years after the breach, that hackers released the stolen email and password combinations.[31]

65. It is within this context that Plaintiffs and thousands of Defendant's patients must now live with the knowledge that their PII/PHI is forever in cyberspace

---

[31] *See* Cory Scott, *Protecting Our Members*, LINKEDIN (May 18, 2016), *available at* https://blog.linkedin.com/2016/05/18/protecting-our-members.

SECOND AMENDED CLASS ACTION COMPLAINT

and was taken by people willing to use the information for any number of improper purposes and scams, including making the information available for sale on the dark web or the black-market.

## CLASS ACTION ALLEGATIONS

66. Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully stated herein.

67. Plaintiffs bring this action on behalf of themselves individually and on behalf of all others similarly situated. The putative class ("the Class") that Plaintiffs seek to represent is composed of:

> All persons in the state of California whose personal data and medical information was disclosed by Enloe to Blackbaud, and was stored in Enloe's Blackbaud systems prior to May of 2020, and/or was given the Notice of Data Privacy Event by or on behalf of Enloe related to the data breach that occurred in May 2020.

68. Excluded from the Class are the natural persons who are directors, officers, and employees of the Defendant.

69. The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of the Class members is unknown to Plaintiffs at this time, such information can be ascertained through appropriate discovery, from records maintained by Defendant.

70. There is a well-defined community of interest among the members of the Class because common questions of law and fact predominate, Plaintiffs' claims are typical of the members of the class, and Plaintiffs can fairly and adequately represent the interests of the Class.

71. Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

   a) Whether Defendants participated in or committed the wrongful conduct alleged herein;

b) Whether Defendants' acts, transactions, or course of conduct constitute the violations of law alleged herein;

c) Whether the members of the Class sustained and/or continue to sustain damages attributable to Defendants' conduct, and, if so, the proper measure and appropriate formula to be applied in determining such damages; and

d) Whether the members of the Class are entitled to injunctive and/or any other equitable relief.

72. Plaintiffs' claims are typical of the claims of all other members of the Class and involve the same violations of law by Defendants as other Class members' claims. Plaintiffs and members of the Class also sustained damages arising out of Defendants' common course of conduct complained herein.

73. As persons who received the abovementioned letter from Defendants regarding an unauthorized disclosure of Plaintiffs' personal information and confidential medical information, Plaintiffs are asserting claims that are typical of the Class. Plaintiffs will each fairly and adequately represent and protect the interests of other members of the Class in that Plaintiffs have no interests known to be antagonistic to any member of the Class.

74. This suit seeks damages and injunctive relief for recovery of injury on behalf of the Class, and it expressly is not intended to request any recovery for personal injury and claims related thereto.  Plaintiffs reserve the right to expand the Class definition to seek recovery on behalf of additional persons as warranted as facts are learned in further investigation and discovery.

75. Plaintiffs and the members of the Class have all suffered irreparable harm as a result of the Defendants' unlawful and wrongful conduct.  Absent a representative lass action, members of the Class will continue to face the potential for irreparable harm described herein. In addition, these violations of law will be allowed to proceed without remedy and Defendants will likely

continue such illegal conduct.  Because of the size of the individual Class member's claims, few, if any, Class members could afford to seek legal redress for the wrongs complained of herein. Furthermore, even if separate actions could be brought by individual purchasers, the resulting multiplicity of lawsuits would cause undue hardship and expense for both the Court and the litigants, as well as create the risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated purchasers, thereby substantially impeding purchasers' ability to protect their interests, while establishing incompatible standards of conduct for Defendants.

76.  Defendants have acted and/or refused to act on grounds generally applicable to the Plaintiffs and other members of the Class, thereby rendering class certification and final injunctive relief and corresponding declaratory relief with respect to members of the Class as a whole appropriate.

77.  As discussed above, numerous common questions of fact and law exist in this matter.  These questions predominate over the individual questions presented in this action.

78.  A class action is a superior method for the fair and efficient adjudication of this controversy.  Class-wide damages are essential to induce Defendants to comply with applicable law. The interest of Class members in individually controlling the prosecution of separate claims against Defendants is small because the damages suffered by individual members of the Class may be minimal. As a result, the expense and burden and litigation would prevent Class members from individually redressing the wrongs done to them. A representative class action is both the appropriate vehicle by which to adjudicate these claims and is essential to the interests of justice.  Furthermore, a class action regarding the issues presented in this matter creates no significant problems of manageability.

//

//

**CAUSES OF ACTION**

**COUNT I**
**VIOLATION OF CAL. CIV. CODE §§ 56, ET SEQ.**
**[CONFIDENTIALITY OF MEDICAL INFORMATION ACT]**

79.  Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully stated herein.

80.  The forgoing acts and omissions constitute violation of the Confidentiality of Medical Information Act, California Civil Code §§ 56, et seq.

81.  Civil Code Section §§ 56, et seq., prohibits health care providers from disclosing medical information regarding a patient without first obtaining written authorization from the patient.

82.  Plaintiffs and similarly situated persons are "patients" of Defendant within the meaning of Civil Code § 56.05(k) and "endanger" within the meaning of Civil Code § 56.05(e) because they fear that the disclosure, release, and actual viewing of their confidential medical information by unauthorized persons subjects them to harassment or abuse or imminent risk of harm.

83.  Defendant is a "provider of health care," within the meaning of Civil Code § 56.05(m) and maintained, and continues to maintain, Plaintiffs' and the putative class members' "medical information" within the meaning of Civil Code § 56.05(j) in electronic form on Defendant's and Blackbaud's computer networks or systems in a manner that did not preserve the confidentiality of the information and negligently failed to protect and preserve confidentiality of electronic medical information of Plaintiffs and the putative class members which was in Defendant's possession and control as required by the CMIA under Civil Code sections 56.10(a), 56.101(a), 56.101(b)(1)(A), and 56.36(e)(2)(E).

84.  Defendant had a legal duty to protect the confidentiality of Plaintiffs' personal information and medical information. Defendant negligently created, maintained, preserved, and/or stored Plaintiffs' confidential medical information including Plaintiffs' and other putative class members' names, addresses, patient

date of birth, phone number and/or email address, medical treatment discharge dates and departments where the patients received care.

85. Defendant's intentional disclosure, delivery, and unauthorized sharing of Plaintiffs' and the putative class members' medical information with Blackbaud for marketing, fundraising, or other unauthorized use for a purpose not necessary to provide health care services to Plaintiffs' and the members of the putative class without any applicable exemption under Civil Code § 56.10(c) and without first obtaining their written authorization, Defendant allowed Plaintiffs' and similarly situated patients' medical information to be accessed, actually viewed, exfiltrated and exposed by unauthorized persons, including Blackbaud, constituting an unauthorized release in violation of Civil Code § 56.101(b)(1)(A) and in violation of Civil Code § 56.10(a) and § 56.10(d).

86. By disclosing Plaintiffs' personal information and private medical information without written authorization, Defendant has violated Cal. Civil Code § 56.10.

87. Defendant has also violated California Civil Code § 56.101, which prohibits the negligent creation, maintenance, preservation, storage, abandonment, destruction, or disposal of confidential medical information. Among other things, Defendant is and was negligent by failing to implement, maintain, and follow reasonable policies and procedures to protect medical information from unauthorized access and disclosure.

88. As a result of Defendant's above-described conduct, Plaintiffs and the Class have suffered damages and continue to be subjected to the imminent risk of damages from the unauthorized release of their individual identifiable "medical information" made unlawful by Civil Code §§ 56.10 and 56.101.

89. Because Civil Code § 56.101 allows for the remedies and penalties provided under Civil Code § 56.36(b), Plaintiffs and the Class seek nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2).

90. Plaintiffs also seek an injunctive order requiring Defendant to cease its violations of the Civil Code §§ 56, et seq. Among other things Defendant should be required to cease negligently handling its patients' medical information

### COUNT II
### VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.
### [CALIFORNIA'S UNFAIR COMPETITION LAW]

91. Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully stated herein.

92. Plaintiffs and Defendants are each "person[s]" as defined by Cal. Bus. & Prof. Code § 17201. Cal. Bus. & Prof. Code § 17204 authorizes a private right of action on both an individual and representative basis.

93. By and through Defendants' conduct alleged in further detail above and herein, Defendants engaged in conduct which constitutes unlawful, unfair, and/or fraudulent business practices prohibited by Bus. & Prof. Code §§ 17200, et seq.

94. "Unfair competition" is defined by Bus. & Prof. Code section § 17200 as encompassing several types of business "wrongs," four of which are at issue here: (1) an "unlawful" business act or practice, (2) an "unfair" business act or practice, (3) a "fraudulent" business act or practice, and (4) "unfair, deceptive, untrue or misleading advertising." The definitions in §§ 17200, et seq. are drafted in the disjunctive, meaning that each of these "wrongs" operates independently from the others.

95. Defendants have engaged in "unlawful" business acts and practices in violation of California Bus. & Prof. Code §§ 17200, et seq. by its conduct in violation of the Confidentiality of Medical Information Act, Civil Code §§ 56.10, 56.101, as alleged above and herein.

96. Had Plaintiffs and members of the Class known that Defendants weren't using reasonable precautions to ensure the safe storage of Plaintiffs' individual identifiable "medical information," and that Defendants were going to released their individual identifiable "medical information," to unauthorized persons

without their authorized written consent in violation of its promises made in its privacy policy and required by the Act, Plaintiffs would not have used Defendants' health care services.

97. Plaintiffs and members of the Class have suffered an injury in fact by a significant exposure of sensitive personal information by Defendants making individual identifiable "medical information," within the meaning of Civil Code § 56.05(j), including their names, medications, medical diagnoses, and other individually identifiable medical information as defined by Civil Code § 56.05(j), released to and viewed by unauthorized persons without their prior written authorization as required by the Act, Civil Code §§ 56.10, 56.101.

98. Additionally, Plaintiffs and members of the Class have suffered a loss of money or property in the form of paying for health care services from Defendants, and have suffered a loss of money or property in that Plaintiffs and the Class have suffered and are each entitled to nominal damages of one thousand dollars ($1,000) pursuant to Civil Code §§ 56.36(b)(1), 56.101.

99. Pursuant to the Bus. & Prof. Code § 17203, Plaintiffs and the Class seek an order of this Court requiring full restitution of all monies wrongfully acquired by Defendants in the form of health care services payments made to Defendants by means of such "unlawful" conduct, so as to restore any and all monies to Plaintiffs and the Class which were acquired and obtained by means of such "unlawful" conduct, and which ill-gotten gains are still retained by Defendants.

100. Pursuant to the Bus. & Prof. Code § 17203, Plaintiffs and the Class also seek an order of this Court for equitable and/or injunctive relief in the form of an order instructing Defendants to prohibit the unauthorized disclosure of their individual identifiable "medical information," and to adequately maintain the confidentiality of their individual identifiable "medical information," and an order enjoining Defendants from disclosing their individual identifiable "medical information," without the prior written authorization of Plaintiffs and each Class

member, as required by the Act. Absent injunctive relief from the Court, Defendants are likely to continue to injure Plaintiffs and the Class.

101. Plaintiffs and other members of the Class have in fact been injured as a result of their reliance on Defendants' material representations and omissions, which are described above.  As a result of this reliance, Defendants has caused harm to Plaintiffs and other members of the Class. Plaintiffs and the other members of the Class have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

102. As a direct and proximate result of the repeated violations described above and herein, Defendants have received and continues to receive unjust revenue and profit at the expense of their competitors and the public.

103. Plaintiffs have suffered an "injury in fact" as a result of Defendants' above-described conduct.

104. Unless Defendants are enjoined from continuing to engage in the unlawful, unfair, fraudulent, untrue, and deceptive business acts and practices as described herein, Plaintiffs and consumers residing within California, will continue to be exposed to and harmed by Defendants' unlawful, unfair, and/or fraudulent business practices.

105. Plaintiffs and the Class seek restitution of excess monies paid to Defendants by Plaintiffs and the Class relating to the representations set forth on Defendants' website in the marketing and description of Defendants' services.

106. In prosecuting this action for the enforcement of important rights affecting the public interest, Plaintiffs seeks the recovery of attorneys' fees, which is available to a prevailing Plaintiffs in class action cases such as this matter

### COUNT III

### NEGLIGENCE

107. Plaintiffs reallege and incorporate by reference all of the above paragraphs as though fully stated herein.

108. Defendant owed various duties to Plaintiffs, including pursuant to the CMIA, as alleged in detail above.  Specifically, Defendants owed a duty to Plaintiffs with regard to its manner of collection and maintenance of Plaintiffs' and the Class members' personal data, including PHI, PII, and medical information.

109. Defendant breached Defendant's respective duties by engaging in the conduct alleged above and in violation of the CMIA.

110. Plaintiffs assert that Defendants are both the actual and legal cause of Plaintiffs' damages.

111. Plaintiffs believe and thereon allege that as a proximate result of Defendants' negligence, Plaintiffs have suffered actual damages and significant emotional distress as described herein and above.

112. Due to the egregious violations alleged herein, Plaintiffs assert that Defendant breached Defendant's respective duties in an oppressive, malicious, despicable, gross and wantonly negligent manner. Defendants' conscious disregard for Plaintiffs' privacy rights entitles Plaintiffs to recover punitive damages.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the Court grant Plaintiffs and the Class members the following relief against Defendant(s):

**As to the First Cause of Action**

- For nominal damages in the amount of one thousand dollar ($1,000) per violation to Plaintiffs each individually and to each member of the Class pursuant to Civil Code § 56.36(b)(1);

- For actual damages according to proof per violation pursuant to Civil Code § 56.36(b)(2);

**As to the Second Cause of Action**

- An award of restitution of all monies wrongfully acquired by Defendants in the form of health care services payments made to Defendants by Plaintiffs and the Class;

- An award of appropriate injunctive and/or declaratory relief preventing such conduct in the future;

**As to the Third Cause of Action**

- An award of actual damages to be determined at trial;
- An award of punitive damages to be determined at trial;

**As to All Causes of Action**

- Certifying this action as a Class Action;
- Appointing each of the named Plaintiffs as Class Representatives;
- Appointing Plaintiffs' attorneys of record as Class Counsel;
- For an award of attorneys' fees as authorized by statute including, but not limited to, the provisions of California Code of Civil Procedure § 1021.5, and as authorized under the "common fund" doctrine, and as authorized by the "substantial benefit" doctrine;
- For costs of the suit;
- For prejudgment interest at the legal rate; and
- Any such further relief as this Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiffs and the Class hereby demand a jury trial on all causes of action and claims with respect to which they have a right to jury trial.

Respectfully submitted,

Dated: May 18, 2021                    **KAZEROUNI LAW GROUP, APC**

By: _____*s/ Abbas Kazerounian*_____
Abbas Kazerounian, Esq.
Mona Amini, Esq.
245 Fischer Avenue, Unit D1
Costa Mesa, California 92626
Telephone: (800) 400-6808
Facsimile:  (800) 520-5523

**CROSNER LEGAL, PC**
Zachary Crosner, Esq.
Blake R. Jones, Esq.

28

Michael R. Crosner, Esq.
433 N. Camden Dr., Ste. 400
Beverly Hills, CA 90210
Telephone: (310) 496-5818
Facsimile:  (310) 510-6429

*Attorneys for Plaintiffs*
*and the putative class*

SECOND AMENDED CLASS ACTION COMPLAINT

# EXHIBIT A

**ENLOE**
**MEDICAL CENTER**
Compliance Department
1531 Esplanade
Chico, CA 95926

September 10, 2020

F7798-L01-0000001 P001 T00001 ***********MIXED AADC 159
SAMPLE A SAMPLE - L01
APT 123
123 ANY ST
ANYTOWN, US 12345-6789

RE: Notice of Data Breach

Dear Sample A Sample:

Enloe Medical Center ("Enloe") writes to inform you of a recent incident that may affect the privacy of some of your information. On Thursday, July 16, 2020, Enloe received notification from one of its third-party vendors, Blackbaud, Inc. ("Blackbaud"), of a cyber incident. Blackbaud is a cloud computing provider that offers customer relationship management and financial services tools to organizations, including Enloe. Upon receiving notice of the cyber incident, we immediately commenced an investigation to better understand the nature and scope of the incident and any impact on Enloe's data. This notice provides information about the Blackbaud incident, our response, and resources available to you to help protect your information from possible misuse, should you feel it necessary to do so.

***What Happened?*** Blackbaud reported that, in May 2020, it experienced a ransomware incident that resulted in encryption of certain Blackbaud systems. Blackbaud reported the incident to law enforcement and worked with forensic investigators to determine the nature and scope of the incident. Following its investigation, Blackbaud notified its customers that an unknown actor may have accessed or acquired certain Blackbaud customer data. Blackbaud reported that the data was exfiltrated by the threat actor at some point before Blackbaud locked the threat actor out of the environment on May 20, 2020. Upon learning of the Blackbaud incident, Enloe immediately commenced an investigation to determine what, if any, sensitive Enloe data was potentially involved. This investigation included working diligently to gather further information from Blackbaud to understand the scope of the incident. The Blackbaud event affected thousands of organizations across many different states and countries. Although not the target of the ransomware incident, Enloe was one of the countless organizations that were impacted.

***What Information Was Involved?*** Our investigation determined that the impacted Blackbaud systems contained your name, address, medical treatment discharge date and department where you received care. The system may have also contained your date of birth, phone number and/or email address. **Your Social Security number, credit card number and bank account information were not present in the Blackbaud system and were therefore not subject to unauthorized access.** Please note that, to date, we have not received confirmation from Blackbaud that your specific information was accessed or acquired by the unknown actor.

***What We Are Doing.*** The confidentiality, privacy, and security of information in our care are among our highest priorities, and we take this incident very seriously. As part of our ongoing commitment to the security of information in our care, we are working to review our existing policies and procedures regarding our third-party vendors, and are working with Blackbaud to evaluate additional measures and safeguards to protect against this type of incident in the future. We will also be notifying the United States Department of Health and Human Services and state regulators, as required.

0000001



F7798-L01

***What Can You Do?***  We recommend you remain vigilant for attempts to obtain sensitive information from you using social engineering.  This is when someone requests you provide sensitive information such as bank account information or Social Security number by using information about your recent medical visit in an attempt to show the request is legitimate.  We also encourage you to review the enclosed *Steps You Can Take to Help Protect Your Information*.  There you will find general information on what you can do to help protect your personal information.

We understand that you may have questions about the Blackbaud incident that are not addressed in this letter.  If you have additional questions, please call our dedicated assistance line at (855) 380-6161 between the hours of 6 AM to 8 PM PT Monday - Friday or 8 AM to 5 PM PT Saturday - Sunday and be prepared to reference Engagement Number DB22362.

We sincerely regret any inconvenience or concern this incident has caused.

Sincerely,

Mike Wiltermood
President and CEO
Enloe Medical Center

*STEPS YOU CAN TAKE TO HELP PROTECT YOUR INFORMATION*

**Monitor Accounts**

While your <u>Social Security number, credit card number and bank account information were not subject to unauthorized access,</u> we encourage you to remain vigilant against incidents of identity theft and fraud, to review your account statements, and to monitor your credit reports for suspicious activity.  Under U.S. law you are entitled to one free credit report annually from each of the three major credit reporting bureaus.  To order your free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228.  You may also contact the three major credit bureaus directly to request a free copy of your credit report.

You have the right to place a "security freeze" on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.  The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent.  However, you should be aware that using a security freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit.  Pursuant to federal law, you cannot be charged to place or lift a security freeze on your credit report.  Should you wish to place a security freeze, please contact the major consumer reporting agencies listed below:

| | | |
|---|---|---|
| **Experian** | **TransUnion** | **Equifax** |
| P.O. Box 9554 | P.O. Box 160 | P.O. Box 105788 |
| Allen, TX 75013 | Woodlyn, PA 19094 | Atlanta, GA 30348-5788 |
| 1-888-397-3742 | 1-888-909-8872 | 1-800-685-1111 |
| www.experian.com/freeze/center.html | www.transunion.com/credit-freeze | www.equifax.com/personal/credit-report-services |

In order to request a security freeze, you will need to provide the following information:

1.  Your full name (including middle initial as well as Jr., Sr., II, III, etc.);
2.  Social Security number;
3.  Date of birth;
4.  If you have moved in the past five (5) years, provide the addresses where you have lived over the prior five years;
5.  Proof of current address, such as a current utility bill or telephone bill;
6.  A legible photocopy of a government-issued identification card (state driver's license or ID card, military identification, etc.);
7.  If you are a victim of identity theft, include a copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft.

As an alternative to a security freeze, you have the right to place an initial or extended "fraud alert" on your file at no cost.  An initial fraud alert is a 1-year alert that is placed on a consumer's credit file.  Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit.  If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years.  Should you wish to place a fraud alert, please contact any one of the agencies listed below:

| | | |
|---|---|---|
| **Experian** | **TransUnion** | **Equifax** |
| P.O. Box 9554 | P.O. Box 2000 | P.O. Box 105069 |
| Allen, TX 75013 | Chester, PA 19016 | Atlanta, GA 30348 |
| 1-888-397-3742 | 1-888-680-7289 | 1-888-766-0008 |
| www.experian.com/fraud/center.html | www.transunion.com/fraud-victim-resource/place-fraud-alert | www.equifax.com/personal/credit-report-services |

0000001



**Additional Information**

You can further educate yourself regarding identity theft, fraud alerts, security freezes, and the steps you can take to protect yourself by contacting the consumer reporting agencies, the Federal Trade Commission, or your state Attorney General.

The Federal Trade Commission can be reached at: 600 Pennsylvania Avenue NW, Washington, DC 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. You can obtain further information on how to file such a complaint by way of the contact information listed above. You have the right to file a police report if you ever experience identity theft or fraud. Please note that in order to file a report with law enforcement for identity theft, you will likely need to provide some proof that you have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and your state Attorney General.

*For Maryland residents*, the Attorney General can be contacted at 200 St. Paul Place, 16th Floor, Baltimore, MD 21202, 1-410-528-8662, www.oag.state.md.us.

*For New Mexico residents*, you have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for your credit score and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting agencies must correct or delete inaccurate, incomplete or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage you to review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For North Carolina residents*, the Attorney General can be contacted at 9001 Mail Service Center, Raleigh, NC 27699-9001, 1-877-566-7226 or 1-919-716-6000, www.ncdoj.gov. You can obtain information from the Attorney General or the Federal Trade Commission about preventing identity theft.

*For New York residents,* the Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; https://ag.ny.gov/.

*For Rhode Island residents,* the Attorney General can be contacted by mail at 150 South Main Street, Providence, RI 02903; by phone at (401) 274-4400; and online at www.riag.ri.gov.

# EXHIBIT B

blackbaud

🔍  📞  👤 Sign in

# Blackbaud Newsroom

Home ➤ Newsroom

## Newsroom

All News

Press Releases

Company Blog

Awards and Recognition

Media Kit

## Additional Resources

Executive Leadership

Investor Relations

Blackbaud Institute

Corporate Social Responsibility

Customer Stories

Industry Analyst Research

## Media Contact

media@blackbaud.com

## Contact Investor Relations

# Learn more about the Ransomware attack we recently stopped

by Blackbaud
*Jul 16, 2020, 01:30 PM*



The Cybercrime industry represents an over trillion-dollar industry that is ever-changing and growing all the time—a threat to all companies around the world. Like many in our industry, Blackbaud encounters millions of attacks each month, and our expert Cybersecurity team successfully defends against those attacks while constantly studying the landscape to stay ahead of this sophisticated criminal industry. We wanted to notify our customers and other stakeholders about a particular security incident that recently occurred.

Summary of Incident

Steve Hufford
Director, Investor Relations
843.654.2655
steve.hufford@blackbaud.com

## Social Media

/////////////////////////////////////////

Connect with Blackbaud on our
social media channels:

    

In May of 2020, we discovered and stopped a ransomware attack. In a ransomware attack, cybercriminals attempt to disrupt the business by locking companies out of their own data and servers. After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted environment. The cybercriminal did not access credit card information, bank account information, or social security numbers. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly. This incident did not involve solutions in our public cloud environment (Microsoft Azure, Amazon Web Services), nor did it involve the majority of our self-hosted environment. The subset of customers who were part of this incident have been notified and supplied with additional information and resources. We apologize that this happened and will continue to do our very best to supply help and support as we and our customers jointly navigate this cybercrime incident.

### More about Blackbaud's Cybersecurity Practices and Next Steps Following this Incident

Over the last five years, we have built a substantial cybersecurity practice with a dedicated team of professionals. Independent reviewers have evaluated our program and determined that it exceeds benchmarks for both the financial and technology sectors. We follow industry-standard best practices, conduct ongoing risk assessments, aggressively test the security of our solutions, and continually assess our infrastructure. We are also a member of various Cyber Security thought leadership organizations, including: The Cloud Security Alliance and Financial Services Information Sharing and Analysis Center (FS-ISAC), where we team up with other experts to share best practices and tactical threat information for the Cyber Security community. We believe the strength of our cybersecurity practice and advance planning is the reason we were able to shut down this sophisticated ransomware attack. We have already implemented changes to prevent this specific issue from happening again. You can review more details on our security, risk, compliance and privacy programs here.



**New to Blackbaud?**

Build a Better World
Markets We Serve
Solution Areas
Explore All Products
Training and Support
Our Cloud Solutions

**About Blackbaud**

Our Leadership
Investor Relations
Careers
Newsroom
Corporate Social Responsibility
Privacy
Security

**Events**

bbcon
Webinars

**Partners and Developers**

Find a Partner

Become a Partner

Partner Marketplace

For Developers

**Resources**

Blackbaud Community

Blackbaud Institute Index

Blackbaud Institute

Customer Stories

Reference Program

sgENGAGE

**Select Your Region**

North America

Canada

Europe

Pacific

     

Manage My Account    Contact Us    Chat With Us

© Copyright 2021 Blackbaud, Inc. All Rights Reserved.

Privacy Policy ^    Terms of Use    Acceptable Use Policy    GDPR    Do Not Sell My Personal Information

# EXHIBIT C

**blackbaud**

WHO WE SERVE    SOLUTIONS    TRAINING AND SUPPORT    INDUSTRY INSIGHTS    COMPANY    › GET STARTED WITH BLACKBAUD

# Security Incident

*Updated September 29, 2020*

The Cybercrime industry represents an over trillion-dollar industry that is ever-changing and growing all the time—a threat to all companies around the world. Like many in our industry, Blackbaud encounters millions of attacks each month, and our expert Cyber Security team successfully defends against those attacks while constantly studying the landscape to stay ahead of this sophisticated criminal industry. We wanted to notify our customers and other stakeholders about a particular security incident that recently occurred.

## Summary of Incident

In May of 2020, we discovered and stopped a ransomware attack. In a ransomware attack, cybercriminals attempt to disrupt the business by locking companies out of their own data and servers. After discovering the attack, our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted (private cloud) environment. Because protecting our customers' data is our top priority, we paid the cybercriminal's demand with confirmation that the copy they removed had been destroyed. Based on the nature of the incident, our research, and third party (including law enforcement) investigation, we have no reason to believe that any data went beyond the cybercriminal, was or will be misused; or will be disseminated or otherwise made available publicly.

## Explanation of Involvement

The majority of our customers were NOT part of this incident. This incident did not involve solutions in our public cloud environment (Microsoft Azure, Amazon Web Services), nor did it involve the majority of our self-hosted (private cloud) environment. No entire product line or private cloud datacenter was part of the incident, which means that how one customer was involved may not be the same as another. Our Blackbaud Merchant Services payment service was not part of this cyber-attack. Because the data involved varied from customer to customer, it is important that our customers speak with Blackbaud to determine their specific level of involvement, if any at all. We have contacted all involved customers to explain their circumstances and provide support.

For those customers where Blackbaud directly communicated involvement in the security incident:

- The cybercriminal did not access credit cardholder data.
- Further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords. In most cases, fields intended for sensitive information were encrypted and not accessible. These new findings do not apply to all customers who were involved in the incident. **Customers who this applies to who are using these fields for such information were contacted the week of September 27, 2020 and were provided with additional support.**

**We sincerely apologize that this happened and will continue to partner closely with our customers as we jointly navigate this cybercrime incident.**

## More about Blackbaud's Cybersecurity Practices and Next Steps Following this Incident

Over the last five years, we have built a substantial cybersecurity practice with a dedicated team of professionals. Independent reviewers have evaluated our program and determined that it exceeds benchmarks for both the financial and technology sectors. We follow industry-standard best practices, conduct ongoing risk assessments, aggressively test the security of our solutions, and continually assess our infrastructure. We are also a member of various Cyber Security thought leadership organizations, including: The

Cloud Security Alliance and Financial Services Information Sharing and Analysis Center (FS-ISAC), where we team up with other experts to share best practices and tactical threat information for the Cyber Security community. We believe the strength of our cybersecurity practice and advance planning is the reason we were able to shut down this sophisticated ransomware attack. We have already implemented changes to prevent this specific issue from happening again. You can review more details on our security, risk, compliance and privacy programs here.



# EXHIBIT D

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 8-K**

**CURRENT REPORT**

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of Report (Date of earliest event reported): **September 29, 2020**



# Blackbaud, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **000-50600** | **11-2617163** |
|---|---|---|
| (State or other jurisdiction of incorporation) | (Commission File Number) | (IRS Employer ID Number) |

**65 Fairchild Street, Charleston, South Carolina 29492**
(Address of principal executive offices) (Zip Code)

Registrant's telephone number, including area code: **(843) 216-6200**

**Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:**

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities Registered Pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol(s) | Name of Each Exchange on which Registered |
|---|---|---|
| **Common Stock, $0.001 Par Value** | **BLKB** | **Nasdaq Global Select Market** |

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

**Item 7.01. Regulation FD Disclosure.**

As previously reported in our Quarterly Report on Form 10-Q for the quarter ended June 30, 2020, on July 16, 2020, we contacted certain customers to inform them about a recent security incident (the "Security Incident"). This information disclosed that in May 2020 we discovered and stopped a ransomware attack. Our Cyber Security team—together with independent forensics experts and law enforcement—successfully prevented the cybercriminal from blocking our system access and fully encrypting files; and ultimately expelled them from our system. Prior to our locking the cybercriminal out, the cybercriminal removed a copy of a subset of data from our self-hosted (private cloud) environment.

After July 16, further forensic investigation found that for some of the notified customers, the cybercriminal may have accessed some unencrypted fields intended for bank account information, social security numbers, usernames and/or passwords. In most cases, fields intended for sensitive information were encrypted and not accessible. These new findings do not apply to all customers who were involved in the Security Incident. Customers who we believe are using these fields for such information are being contacted the week of September 27, 2020 and are being provided with additional support.

We expect our Security Incident investigation and security enhancements to continue for the foreseeable future. We intend to continue to inform our customers, stockholders and other stakeholders of any such additional information or developments as appropriate.

**Forward-Looking Statements**

Except for historical information, all of the statements, expectations and assumptions contained in this Current Report on Form 8-K are forward-looking statements that are subject to the safe harbor provisions of the Private Securities Litigation Reform Act of 1995, including, but not limited to, statements regarding future developments related to the Security Incident and any potential impact on our financial condition and results of operations. These statements involve a number of risks and uncertainties. Although we attempt to be accurate in making these forward-looking statements, it is possible that future circumstances might differ from the assumptions on which such statements are based. In addition, other important factors that could cause results to differ materially include the risk factors set forth from time to time in our filings with the Securities and Exchange Commission (the "SEC"), copies of which are available free of charge at the SEC's website at www.sec.gov or upon request from our investor relations department. We assume no obligation and do not intend to update these forward-looking statements, except as required by law.

The information contained in this Item 7.01 is being furnished and shall not be deemed filed for purposes of Section 18 of the Securities Exchange Act of 1934, as amended, or otherwise subject to the liabilities of Section 18. Furthermore, the information contained in this Item 7.01 shall not be deemed to be incorporated by reference into any registration statement or other document filed pursuant to the Securities Act of 1933, as amended.

SIGNATURES

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

**BLACKBAUD, INC.**

Date:   September 29, 2020          /s/ Anthony W. Boor

Anthony W. Boor
Executive Vice President and Chief Financial Officer
(Principal Financial and Accounting Officer)

## CERTIFICATE OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action.  My business address is Kazerouni Law Group, APC, 245 Fischer Avenue, Unit D1, Costa Mesa, CA 92626. On May 18, 2021, I served the within document(s):

- **PLAINTIFFS' SECOND AMENDED CLASS ACTION COMPLAINT**

☒      CM/ECF - by transmitting electronically the document(s) listed above to the electronic case filing system on this date before 11:59 p.m.   The Court's CM/ECF system sends an e-mail notification of the filing to the parties and counsel of record who are registered with the Court's CM/ECF system.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct.  Executed on May 18, 2021, at Costa Mesa, California.

_____/s/ Abbas Kazerounian_____
ABBAS KAZEROUNIAN, ESQ.

- 1 -
CERTIFICATE OF SERVICE